**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(c)

**GENOVA BURNS LLC**
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Phone: (973) 467-2700
*Counsel for Robert H. Sickles and AHS Realty, LLC.*
**DANIEL M. STOLZ, ESQ.**
**JEFFREY R. RICH, ESQ.**
**DONALD W. CLARKE, ESQ.**
**JACLYNN N. McDONNELL, ESQ.**
*dstolz@genovaburns.com*
*jrich@genovaburns.com*
*dclarke@genovaburns.com*
*jmcdonnell@genovaburns.com*

| | |
|---|---|
| In re: | Case No.: 24-14781 |
| **ROBERT H. SICKLES**, | Judge: Hon. Christine M. Gravelle |
| Debtor-in-Possession. | Chapter 11 |
| In re: | Case No.: 24-14779 |
| **AHS REALTY LLC**, | Judge: Hon. Christine M. Gravelle |
| Debtor-in-Possession. | Chapter 11 |

**SECOND AMENDED DISCLOSURE STATEMENT TO THE JOINT CHAPTER 11 PLAN
OF REORGANIZATION FOR ROBERT H. SICKLES AND AHS REALTY, LLC**

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS JOINT PLAN OF REORGANIZATION. ROBERT H. SICKLES AND AHS REALTY, LLC BELIEVE THAT THIS JOINT PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. ROBERT H. SICKLES AND AHS REALTY, LLC URGE THAT THE VOTERS ACCEPT THE PLAN.**

**ROBERT H. SICKLES**
**AHS REALTY, LLC**

BY: <u>/s/ Robert H. Sickles</u>
**ROBERT H. SICKLES**
*Individually, and as*
*Managing Member of AHS Realty, LLC*
*Plan Proponent*

# I.

# INTRODUCTION

ROBERT H. SICKLES and AHS REALTY, LLC ("Debtors" or "Proponents") are each debtors in their respective Chapter 11 bankruptcy cases. On May 9, 2024, the Debtors each commenced bankruptcy cases by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 101 et seq. Chapter 11 of the Code allows the Debtors to propose a plan of reorganization ("Plan"). The Plan may provide for the Debtors to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtors are the parties proposing the Plan sent to you in the same envelope as this document. **THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN WHICH IS REFERENCED HEREIN**.

This is a liquidating reorganization plan. In other words, the Proponents seek to accomplish payments under the Plan transferring most of the Debtors' assets to 1663 in exchange for 1663 making payments necessary to confirm the Plan. This is detailed in the Amended Plan Support Agreement ("PSA") attached as **Exhibit A**. 1663 shall serve as the Plan Co-Proponent. The Effective Date of the proposed Plan means a Business Day, selected by the Plan Administrator, on which all conditions to the Effective Date have been satisfied or, if permitted, waived by the Plan Co-Proponent, and on which no stay of the Confirmation Order shall be pending.

A.    **Purpose of This Document**

This document is the "Disclosure Statement," which summarizes the Plan and provides certain information about it and the process the Court follows in determining whether or not to confirm it.

1

**<u>READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO
KNOW ABOUT</u>:**

    **(1)    WHO CAN VOTE OR OBJECT,**

    **(2)    THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

    **(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

    **(4)    WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

    **(5)    THE EFFECT OF CONFIRMATION, AND**

    **(6)    THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

**BE SURE TO READ THE PLAN, PLAN SPONSOR AGREEMENT, AND THE DISCLOSURE STATEMENT. IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN, PLAN SPONSOR AGREEMENT, OR THE DISCLOSURE STATEMENT, THE PLAN PROVISIONS WILL GOVERN. ALL CAPITALIZED TERMS NOT DEFINED HEREIN SHALL BE ATTRIBUTED THE MEANING DEFINED IN THE PLAN OR THE PLAN SPONSOR AGREEMENT.**

Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of a debtor to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court ("Court") will make a determination about whether the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Code Section 1124.

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtors or who has filed a proof of claim against the Debtors, and to each interest holder of record as of the date of approval of this Disclosure Statement.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.**    **Confirmation Procedures**

Persons Potentially Eligible to Vote on the Plan

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtors as undisputed, non-contingent and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan.  The Ballot Form that you received does not constitute a proof of claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtors' schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, New Jersey 08608.  The Clerk of the Bankruptcy Court will not provide this information by telephone.

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.**

1.    **Time and Place of the Hearing on the Disclosure Statement and the Hearing on the Confirmation of the Plan.**

The hearings on the sufficiency of this Disclosure Statement and for Confirmation of the Plan will take place at times and dates **_that will be disclosed in an order scheduling same_**, before the Honorable Christine M. Gravelle, USBJ, in Courtroom no. 3, in the Clarkson S. Fisher U.S. Courthouse, 402 East State Street, Trenton, New Jersey, 08608.  The Debtors reserve the right to request an adjournment of the hearing, as needed, based on its own discretion and the needs of the Proponents and Co-Proponent, or for any reason determined to be necessary. Notice of any hearings or adjournments thereof shall be filed on the docket.

2.    **Deadline for Voting for or Against the Plan**

If you are entitled to vote, the Debtors will provide a ballot to you for that purpose. It is in your best interest to timely vote at the appropriate time and return the ballot to counsel for the Debtors, Genova Burns, LLC, located at 110 Allen Road, Suite 304, Basking Ridge, New Jersey 07920, _to the attention of_: Daniel M. Stolz, Esq.

When the voting deadline is established, you will be provided with notice of that deadline and a ballot. **YOUR BALLOT MUST BE RECEIVED BY THE DEADLINE OR IT WILL NOT BE COUNTED.**

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be (i) filed with the Court and (ii) served upon counsel for (a) the Proponents, Genova Burns, LLC, located at 110 Allen Road, Suite 304, Basking Ridge, New Jersey 07920, *to the attention of*: Daniel M. Stolz, Esq., or via e-mail at *dstolz@genovaburns.com*, and (b) Co-Proponent, Much Shelist P.C., located at XXX, *to the attention of*: Jonathan Friedland, Esq., or via e-mail at *jfriedland@muchlaw.com*.

### 4. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for the Proponents, Genova Burns, LLC, located at 110 Allen Road, Suite 304, Basking Ridge, New Jersey 07920, *to the attention of*: Daniel M. Stolz, Esq., or via e-mail at *dstolz@genovaburns.com*.

## C. Disclaimer

The financial data relied upon in formulating the plan is based on the information contained in the Debtors' Petition and other information upon which the Debtors' professionals have relied during the administration of this case. If you have questions about any financial data relied upon for this Disclosure Statement or the Plan, you may forward your questions to counsel for the Debtor, Genova Burns, LLC, located at 110 Allen Road, Suite 304, Basking Ridge, New Jersey 07920, *to the attention of*: Daniel M. Stolz, Esq., or via e-mail at *dstolz@genovaburns.com*.  The Debtors represent that everything stated in the Disclosure Statement is true to the best of the Debtors' knowledge.

**PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.**

## II.

## BACKGROUND

**A.    Description and History of the Debtors**

AHS is a New Jersey limited liability company, whose sole member is Robert H. Sickles. AHS is the current owner of real property and improvements located at 1 Harrison Avenue, Little Silver, New Jersey (the "Little Silver Property").  The Little Silver Property consists of approximately 6 acres.  While the property is zoned as residential, it has housed a non-debtor entity, the Sickles Market, for 116 years.

The Little Silver Property was acquired by the Parker Family in 1663, as a result of a land grant from the King of England to Peter Parker of Rhode Island.  Parker later moved to the Little Silver area and married into the Sickles family.

**B.    Principals/Affiliates of Debtor's Business**

Prior to October 10, 1997, the Little Silver Property had been passed down, through inheritance, from one member of the Sickles Family to another.  On October 10, 1997, Robert W. Sickles and Adelaide H. Sickles conveyed the Little Silver Property to AHS.  On or about September 13, 2002, Robert H. Sickles purchased the ownership interest in AHS.

**C.  Management of the Debtor Before and During the Bankruptcy**

The Sickles Market was opened by Harold Sickles and his wife Elsie in 1908.  In 1945, Robert W. Sickles, joined his parents in the operation of the Sickles Market and in 1978, Robert H. Sickles (the affiliated debtor), began working at the Market.  Before it recently closed, Robert H. Sickles was responsible for the operations of the Sickles Market, and his daughters, Tori and Sasha were employed by the Sickles Market.  Ultimately, ownership of the Sickles Market was conveyed to a non-debtor entity Sickles Market, LLC.

6

**D.**     **Events Leading to Chapter 11 Filing**

In 2019, the Sickles family determined to open a second market and a liquor store in Red Bank, New Jersey (the "Red Bank Market").  Funding for the Red Bank market and the liquor store was provided through a $2.5 million commercial mortgage loan and a $1.1 million line of credit from Two Rivers Bank.  The Red Bank Market is owned by non-debtor entity Sickles Provisions LLC ("Provisions") and the liquor store, operating under the name of "Bottles by Sickles," is owned by an affiliated debtor, TST Beverages LLC ("Bottles"), in a chapter 11 bankruptcy pending in the USBC for the DNJ (case no.: 24-14130) (the "Bottles Bankruptcy").  Bottles and the Red Bank Market officially opened on August 6, 2020.

Unfortunately, the opening of Red Bank Market and Bottles faced a number of issues, including coinciding with the height of the COVID pandemic.  Availability for parking of customers of Bottles and the Red Bank Market proved to be substantially less than the landlord had suggested it would be.  Moreover, as the COVID pandemic increased, foot traffic from commuters decreased.

It became difficult to find experienced food retail labor workers due to the COVID pandemic.  Labor and other costs across all entities increased while revenue across all entities decreased.

At the height of the pandemic, sales at the Sickles Market averaged 20% below pre-pandemic levels.  Simultaneously, the pandemic essentially choked the opening and prospects for the Red Bank Market and Bottles.  The pandemic also delayed the expansion by the Town of Red Bank into the location of the Red Bank Market and Bottles, further heightening losses and reducing foot-traffic at the Red Bank location for both the Red Bank Market and Bottles.

Due to the consumer behavior changes after the COVID pandemic, the Red Bank Market and Bottles never accumulated the foot traffic and commuter traffic planned for that space. With a lease already signed with Metrovation, and personally guaranteed by Robert H. Sickles, there was no choice but to move forward into a retail climate that was not suited to a *very expensive* $34 per square foot of rent to which the Red Bank Market and Bottles were bound.

The operating losses of the Sickles Market, Red Bank Market, and Bottles were huge. With the hope that the end of the COVID pandemic would restore the Sickles Market, Red Bank Market, and Bottles to profitability, the Sickles entities refinanced the Two Rivers loan through Northfield Bank.

On or about November 9, 2022, AHS and other Sickles entities obtained two loans from Northfield Bank providing gross loan proceeds of $5 million. The first loan was a line of credit in the maximum amount of $500,000.00, evidenced by a Promissory Note dated November 9, 2022. To secure the Promissory Note, AHS provided a mortgage encumbering the Little Silver Property in favor of Northfield Bank. Robert H. Sickles and his non-debtor spouse executed a mortgage encumbering their principal residence in Rumson. Robert H. Sickles and his non-debtor spouse executed guarantees (hers limited to her interest in the real property) on the first loan. In addition, Sickles Management, Inc., Sickles Market LLC, Sickles Provisions LLC, and TST Beverages LLC executed guarantees as well as security agreements encumbering all the assets of those entities.

Also on November 9, 2022, Northfield extended a term loan in the principal amount of $4,500,000.00, evidenced by a Promissory Note dated November 9, 2022. The term loan was secured by a commercial mortgage against AHS's Little Silver Property, a mortgage against the Rumson Property, as well as guarantees from Sickles Management, Inc., Sickles Market LLC, Sickles Market Provisions LLC, and TST Beverages LLC, and security interests in the assets of

8

those entities. Robert H. Sickles and his non-debtor spouse executed guarantees (hers limited to her interest in the real property) on the term loan.

Northfield declared a default under both loans and has indicated its intention to enforce its mortgages and liens against the real and personal property.

Northfield insisted, as part of the loan, that a lease be executed between AHS and the Sickles Market.  The lease is what is commonly referred to as a "triple net lease", requiring Sickles Market to pay utilities, taxes, and insurance.

Unfortunately, even with the Northfield funding, the entities were unable to stem the tide of losses.  The Sickles family utilized every resource available to them, including Robert H. Sickles' 401(k) account, to attempt to keep the "ships afloat." The losses continued and rent to the Red Bank Market and Bottles landlord (Metrovation) became significantly delinquent.

A decision was made that the Red Bank Market would have to close as there was no prospect that the losses at Red Bank Market would cease.  The Red Bank Market closed on February 15, 2024.

In March of 2023, the situation at the Sickles Market also became financially unmanageable.  On March 11, 2024, after 116 years of continuous operation, the Sickles Market in Little Silver due to its inability to make payroll.

Bottles closed shortly thereafter, on April 17, 2024, and filed the Bottles Bankruptcy, on April 23, 2024.

**E.    Significant Events During the Bankruptcy**

**1.    Bankruptcy Proceedings**

The following is a chronological list of significant events which have occurred during this

case:

On May 9, 2024, AHS filed a voluntary petition for relief under Chapter 11, Subchapter V of the United States Bankruptcy Code (the "AHS Petition Date") [Case: 24-14779, Doc 1].

On May 9, 2024, Robert Sickles filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Sickles Petition Date") [Case: 24-14781, Doc 1].

Robert H. Sickles submitted a certification in support of this Case and various first day pleadings with substantial detail on the history of the Debtor and its operations, its financial condition, and the events leading up to this Case (the "First Day Certification"). [Case: 24-14781, Doc 7; Case: 24-14779; Doc 12]

On May 14th, 2024, due to an error during the filing process, the Debtor filed an Amended Petition and unselected the designation of AHS as a "Single Asset Real Estate" case. [Case: 24-14779; Doc 9]

On May 29, 2024, the Debtors sat for the Initial Debtor Interview.

On May 31, 2024, Genova Burns, LLC was authorized by Order of this Court to serve as bankruptcy counsel. [Case: 24-14779, Doc 20; Case: 24-14781, Doc 17]

On June 11, 2024, after consultation with attorneys representing the U.S. Trustee, the Debtor filed a second Amended Petition designating AHS as a Single Asset Real Estate ("SARE") case and unselected the option of Subchapter V. [Case: 24-14779, Doc 25]

On June 18, 2024, the Debtors sat for the § 341 meeting of creditors.

On June 20, 2024, the Debtors filed a motion to substantively consolidate its case with that of Robert H. Sickles. [Case: 24-14779, Doc 31; Case: 24-14781, Doc 26]

On July 11, 2024, Farmlind Produce, LLC and Four Seasons Produce, Inc., vendors of certain of the Sickles' entities, filed an adversary proceeding seeking a declaratory judgment and enforcement of an alleged interest pursuant to the Perishable Agricultural Commodities Act ("PACA") over the Little Silver Property owned by AHS (Case no.: 24-01486, Doc 1) (the "PACA Adversary").

On July 11, 2024, Farmlind Produce, LLC and Four Seasons Produce, Inc., vendors of certain of the Sickles' entities, filed an adversary proceeding seeking a judgment to determine their PACA interests are non-dischargeable (Case no.: 24-01487, Doc 1) (the "PACA Dischargeability Adversary").

The Debtors' deadline to file an answer has been extended upon consent between the parties while they attempt to amicably resolve those issues.

After negotiations with the attorneys for the U.S. Trustee and Northfield Bank, the Debtor consented to withdraw its motion for substantive consolidation without prejudice and, on July 30, 2024, filed a motion for joint administration. [Case: 24-14779; Doc 40]

On August 6, 2024, AHS filed a plan and disclosure statement. [Case: 24-14779; Doc 45 and 46]

On August 27, 2024, the Court granted Robert H. Sickles motion for authorization to execute a memorandum of understanding ("MOU") with a private investment group, 1663 Partners LLC ("1663") (the "Motion for MOU Authorization"). [Case: 24-14781, Doc 83]

On August 27, 2024, the Court granted the Debtors' motion for joint administration. [Case: 24-14781, Doc 81]

By Orders dated August 29, 2024 [Case: 24-14779, Doc 74; Case: 24-14781, Doc 86], the extended the Debtors' exclusive period to file and solicit votes for a plan through November 5, 2024 and January 13, 2024, respectively.

After a hearing on the Robert H. Sickle's second motions to extend exclusivity [Case: 24-14781, Doc 118], the Court extended Robert H. Sickle's exclusive period to file a plan through and including November 19, 2024, and the exclusive period to solicit votes thereon through and including January 27, 2024.

Since the filing of the bankruptcy petition, AHS has engaged in numerous discussions regarding the reorganization of the Debtors' assets and interests.

Through counsel, AHS has been engaged in ongoing discussions with Northfield Bank with regard to the Northfield Loans and alternatives to liquidate or reorganize assets to satisfy the outstanding amounts. By Order entered September 30, 2024, the Court granted stay relief to Northfield to begin foreclosure proceedings against the Debtor's principal residence located at 4 Harrison in Rumson, New Jersey.

Through counsel, AHS has engaged in numerous communications with counsel for the PACA Plaintiffs and has disputed the assertion of the attachment of trust claims to certain of my assets.

**2.      Other Legal Proceedings**

As of this filing, AHS is not a party to other legal proceedings. Robert H. Sickles is a party to several state court lawsuits related to personal guarantees extended on behalf of the Sickles business interests.

**3.      Actual and Projected Recovery of Preferential or Fraudulent Transfers**

The Debtors are aware of no potential preferences or fraudulent transfers.

**4.      Procedures Implemented to Resolve Financial Problems**

As detailed above, 1663 will fund the Plan.

**III.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**A.      What Creditors and Interest Holders Will Receive Under the Proposed Plan**

The Plan classifies claims and interests in various classes. The Plan states whether each

class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class

will receive.

**B.      Treatment of Unclassified Claims**

**1.      Administrative Claims**

(a)      Subject to the Bar Date and other provisions herein and except to the extent
Newco, or the Plan Administrator, as applicable, and the holder of an Allowed
Administrative Claim agree to different and less favorable treatment, the Plan
Administrator shall pay, in full satisfaction and release of such Claim, to each holder of an
Allowed Administrative Claim, Cash, in an amount equal to such Allowed Administrative
Claim, on the later of (i) the Effective Date and (ii) the first Business Day after the date that
is 30 calendar days after the date on which such Administrative Claim becomes an Allowed
Administrative Claim, or as soon thereafter as is practicable. Allowed Administrative
Claims shall be paid from the funds in the Administrative Claims Fund. For the avoidance
of doubt, (i) Professional Fee Claims as provided in the Professional Fee Budget, (ii) the
DIP Claim, if any, and (iii) the Substantial Contribution Claims shall all be Allowed
Administrative Claims.

**2.      Administrative Claim Bar Date**

(a)      General Administrative Claim Bar Date Provisions. Except as provided
below for (a) Professionals requesting compensation or reimbursement for Professional Fee
Claims, and (b) US Trustee Fees, requests for payment of Administrative Claims must be
filed no later than 30 days after notice of entry of the Confirmation Order is filed with the
Bankruptcy Court or such later date as may be established by Order of the Bankruptcy
Court. Holders of Administrative Claims who are required to file a request for payment of
such Claims and who do not file such requests by the applicable Bar Date, shall be forever
barred from asserting such Claims against the Debtors or their property, and the holder
thereof shall be enjoined from commencing or continuing any action, employment of

process or act to collect, offset, or recover such Administrative Claim.

(b)      <u>US Trustee Fees.</u> The Debtors, Newco, or Plan Administrator (as applicable) shall pay all US Trustee Fees, in accordance with the terms of the Plan, until such time as the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

**3.       Priority Tax Claims.**

Except to the extent the Debtors or Newco, as applicable, and the holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, Newco or Plan Administrator shall pay, in full satisfaction and release of such Claim, to each holder of a Priority Tax Claim, Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective Date and (b) the first Business Day after the date that is 30 calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable.

**C.       Classification and Treatment of Classified Claims and Equity Interests**

**1.   General Notes on Classification and Treatment of Classified Claims and Equity Interests**. Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Equity Interests (other than Claims arising under sections 507(a)(2) or 507(a)(8) of the Bankruptcy Code, which Claims do not require classification pursuant to section 1123(a) of the Bankruptcy Code and are receiving the treatment set forth in Article II) are classified for all purposes, including, without limitation, voting, confirmation, and distribution pursuant to the Plan, as set forth herein. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.

**2. Special Provision Governing Unimpaired Claims**. Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors, the Reorganized Debtor, or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**3. Classification and Treatment of Classified Claims Against and Equity Interests of AHS Realty, LLC**

| Class | Treatment | Entitled to Vote |
|---|---|---|
| Class AHS 1 –Priority Claims | Unimpaired | No (Deemed to accept) |
| Class AHS 2 – Northfield Claim | Unimpaired | No (Deemed to accept) |
| Class AHS 3 – General Unsecured Claims | Impaired | Yes (Entitled to vote to accept or reject) |

| Class AHS 4– Equity Interests | Impaired | No (Deemed to reject) |
|---|---|---|

(a) **Class AHS 1: Priority Claims**

 i.  Class AHS 1 Treatment. Except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Claim, at the sole option of the Plan Administrator, each holder of an Allowed Priority Claim shall receive: (A) Cash in an amount equal to the amount of such Allowed Priority Claim from the Administrative Claims Fund on the later of (1) the Effective Date, and (2) for Claims in Class 1 that were Disputed Claims and thereafter became Allowed Priority Claims, immediately following the date upon which such Claims became Allowed Priority Claims, or as soon thereafter as is practicable, (B) such other treatment so as to render such holder's Allowed Priority Claim Unimpaired.

 ii.  Class AHS 1 Voting. Holders of Allowed Priority Claims in Class AHS 1 are not Impaired under the Plan. Each holder of an Allowed Priority Claim is conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

(b) **Class AHS 2: Northfield Claim**

 i.  Class AHS 2 Treatment. The holder of the AHS Class 2 Claim shall be paid 100% of the Northfield Allowed Claim on the Effective Date in full and final satisfaction of such Claim.

 ii.  Class AHS 2 Voting. Deemed to Accept.

(c) **Class AHS 3: General Unsecured Claims**

 i.  Class AHS 3 Treatment. Provided that the holder of an AHS Class 3 Claim has not yet been paid, on the later of (A) the Effective Date and (B) for Claims in AHS Class3 that were Disputed Claims on the Effective Date and have thereafter become Allowed General Unsecured Claims, immediately following the Distribution Date subsequent to the date upon which such Claims became Allowed General Unsecured Claims, or as soon thereafter as is practicable, holders of each such Allowed General Unsecured Claim shall receive its pro rata share of the General Unsecured Claims Cash Distribution.

 ii.  Class AHS 3 Voting. Class AHS 3 is Impaired under the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

(d) **Class AHS 4: Equity Interests**

 i.  Class AHS 4 Treatment. On the Effective Date, Equity Interests shall be deemed cancelled, and the holders of Equity Interests shall not receive or retain any property under the Plan on account of such Interests.

 ii.  Class AHS 4 Voting. Equity Interests are Impaired under the Plan, and the holders of Equity Interests are conclusively deemed to reject the Plan under section 1126(g) of the

Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan in their capacity as a holder of such Equity Interests.

### 4. Classification and Treatment of Classified Claims Against Robert H. Sickles.

| Class | Treatment | Entitled to Vote |
|---|---|---|
| Class RS 1 – Priority Claims | Unimpaired | No (Deemed to accept) |
| Class RS 2 – Northfield Claim | Unimpaired | No (Deemed to accept) |
| Class RS 3 – State of NJ Department of Taxation Claims | Unimpaired | No (Deemed to accept) |
| Class RS 4 – Bluestone (aka BCC) Claim | Impaired | Yes (Entitled to vote to accept or reject) |
| Class RS 6 – Employee Claims | Impaired | Yes (Entitled to vote to accept or reject) |
| Class RS 7 – General Unsecured Claims | Impaired | Yes (Entitled to vote to accept or reject) |
| Class RS 8 – Subordinated Claims | Impaired | No (Deemed to reject) |

(a) **Class RS 1: Priority Claims**

i.  <u>Class RS 1 Treatment</u>. Except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Claim, at the sole option of the Plan Administrator, each holder of an Allowed Priority Claim shall receive: (A) Cash in an amount equal to the amount of such Allowed Priority Claim from the Administrative Claims Fund on the later of (1) the Effective Date, and (2) for Claims in Class 1 that were Disputed Claims and thereafter became Allowed Priority Claims, immediately following the date upon which such Claims became Allowed Priority Claims, or as soon thereafter as is practicable, (B) such other treatment so as to render such holder's Allowed Priority Claim Unimpaired.

ii.  <u>Class RS 1 Voting.</u> Holders of Allowed Priority Claims in Class 1 are not Impaired under the Plan. Each holder of an Allowed Priority Claim is conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

(b) **Class RS 2: Northfield Claim**

i.  <u>Class RS 2 Treatment</u>. The holder of the RS Class 2 Claim shall be paid 100% of the Northfield Allowed Claim on the Effective Date in full and final satisfaction of such Claim.

ii.  <u>Class RS 2 Voting</u>. Deemed to Accept.

16

(c) **Class RS 3: State of New Jersey Claims**

    i.   <u>Class RS 3 Allowance</u>. All Allowed Claims filed by the State of New Jersey other than those related to unpaid wages, which are treated as Class RS 7 Claims, are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of [$848,000].

    ii.   <u>Class RS 3 Treatment</u>. The holders of Allowed Class RS 3 Claims shall receive, in full and final satisfaction of such Claim payment in full of all such Allowed Claims.

    iii.   <u>Class RS 3 Voting</u>. Class RS 3 is not Impaired under the Plan and the holder of an Allowed RS 3 Claim is conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

(d) **Class RS 4: Bluestone Claim**

    i.   <u>Class RS 4 Allowance</u>. The Bluestone Claim in Class RS 4 is Allowed as follows:

        a.   The Bluestone Claim shall be allowed in the amount of $575,000 if Bluestone receives its distribution on or before February 1, 2025;

        b.   The Bluestone Claim shall be allowed in the amount of $585,000 if Bluestone receives its distribution on or after February 2, 2025, but before March 1, 2025.

    ii.   <u>Class RS 4Treatment</u>. The holder of the Class RS 4 Bluestone Claim shall receive the above treatment in full and final satisfaction of such Claim.

    iii.   <u>Class RS 4 Voting</u>. Class RS 4 is Impaired under the Plan. The holder of the Bluestone Claim is entitled to vote to accept or reject the Plan

(e) **Class RS 6: Employee Claims**

    i.   <u>Class RS 6 Treatment.</u> Provided that the holder of a Class RS 6 Claim has not yet been paid, on the later of (A) the Effective Date and (B) for Claims in Class RS 6 that were Disputed Claims on the Effective Date and have thereafter become Allowed Class RS 6 Claims, immediately following the Distribution Date subsequent to the date upon which such Claims became Allowed RS 6 Claims, or as soon thereafter as is practicable, holders of each such Allowed RS 6 Claim shall receive 100% of its Allowed Wage Claim and two(2) week's pay in full satisfaction of any and all statutory or common law right to severance. Resolution of the severance claims hereunder shall be deemed a settlement Pursuant to Federal Bankruptcy Rule 9019

    ii.   <u>Class RS 6 Voting.</u> Class RS 6 is Impaired under the Plan. Each holder of an Allowed

(f) **Class RS 7: General Unsecured Claims**

    i.   <u>Class RS-7 Treatment</u>. Provided that the holder of a Class RS 7 Claim has not yet been paid, on the later of (A) the Effective Date and (B) for Claims in Class RS 7 that were Disputed Claims on the Effective Date and have thereafter become Allowed General Unsecured Claims, immediately following the Distribution Date subsequent to the date upon which such Claims became Allowed General Unsecured Claims, or as soon

thereafter as is practicable, holders of each such Allowed General Unsecured Claim shall receive its pro rata share of the General Unsecured Claims Cash Distribution.

    ii.   <u>Class RS 7 Voting</u>. Class RS 7 is Impaired under the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

**(g) Class RS 8: Subordinated Claims**

    i.   <u>Class RS 8 Treatment</u>. On the Effective Date, the holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.

    ii.   <u>Class RS 8 Voting</u>. Subordinated Claims are Impaired under the Plan, and the holders of Subordinated Claims are conclusively deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan in their capacity as a holder of such Subordinated Claims.

**D.    Means of Effectuating the Plan**

    **1.    Funding for the Plan**

The Plan will be funded through the Plan Sponsor Agreement, as well as the proceeds from any other Assets available to fund the Plan. The details of funding and anticipated timing thereof are detailed in the Plan Sponsor Agreement. On the Effective Date, the Plan Administrator will receive Plan Funding from Plan Co-Proponent. The Plan Funding shall be used to make distributions as provided in the Plan and to fund other distributions, costs, and expenses contemplated by the Plan.

    **2.    Post-confirmation Management**

1663 or an affiliate of 1663 intends to form a new company ("Newco"). Newco, in turn, will own 100% of three subsidiaries: "Market Newco," "Brand Newco," and "Land Newco" (collectively, "Newco Subs").

Newco will be managed by 1663. No insider of the Debtors will own any equity in Newco or any of the Newco Subs on the Effective Date. Certain insiders, however, are expected to be employees of one or more Newco Sub pursuant to Section 7 of the PSA and that certain Letter Agreement (as that term is defined in the PSA). **The Letter Agreement has not been filed with**

the Court but is available for review upon request of a party in interest to Debtors' counsel, Daniel M. Stolz at DStolz@genovaburns.com and the execution of a non-disclosure agreement ("NDA") acceptable to Debtors, provided, however, if a party in interest requests to review the Letter Agreement and is unwilling to execute such NDA, the Debtors' counsel will immediately contact the Court and the Court shall decide whether such request should be granted and on what terms.

**3.      Disbursing Agent**

The Plan Administrator shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Plan Administrator shall be compensated at their customary professional rates or as set forth in the Plan.

**E.      Other Provisions of the Plan**

**1.      Executory Contracts and Unexpired Leases**

The Plan provides that all Executory Contracts and Unexpired Leases, except for those specifically assumed by the Debtor in writing or previously assumed by Court Order, shall be deemed rejected. The Confirmation Order shall constitute an order approving the rejection of the lease or contract. If the rejection of an executory contract or unexpired lease, results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors, Newco or its property, or the Plan Administrator unless a proof of claim is filed with the Bankruptcy Court and served upon the Plan Administrator not later than 30 days after the date of service of notice of entry of the Confirmation Order, or such other period set by the Bankruptcy Court. Any such Claim, to the extent Allowed, shall be classified as a Class AHS 3 or RS 7 General Unsecured Claim.

**2.      Changes in Rates Subject to Regulatory Commission Approval**

This Debtors are not subject to governmental regulatory commission approval of its rates.

**3.      Retention of Jurisdiction**

 The Court will retain jurisdiction as provided for in the Plan.

**4.      Procedures for Resolving Contested Claims**

Notwithstanding any other provision of the Bankruptcy Code and unless otherwise ordered by the Bankruptcy Court, on and after the Effective Date, the Plan Administrator shall have the exclusive right to make, file, and prosecute objections to and settle, compromise, or otherwise resolve Disputed Claims, except that as to applications for allowances of Professional Fee Claims, objections may be made in accordance with the applicable Bankruptcy Rules by parties in interest. Subject to further extension by the Bankruptcy Court, the Plan Administrator shall file and serve a copy of any such objection upon the holder of the Claim to which an objection is made on or before the latest to occur of: (i) 60 days after the Effective Date, (ii) 30 days after a request for payment or proof of claim is timely filed and properly served upon the Plan Administrator, and (iii) such other date as may be fixed by the Bankruptcy Court either before or after the expiration of such time periods. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the Plan Administrator effects service in any of the following manners (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first-class mail, postage prepaid, on the signatory of the proof of Claim or other representative identified in the proof of claim or any attachment thereto at the address of the creditor set forth therein; or (c) by first-class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim

or Cause of Action pursuant to the terms of the Plan without further order of the Bankruptcy

Court.

### 5.      Effective Date

The Effective Date of the proposed Plan means a Business Day, selected by the Plan

Administrator, on which all conditions to the Effective Date have been satisfied or, if permitted,

waived by the Plan Co-Proponent, and on which no stay of the Confirmation Order shall be

pending.

### 6.      Modification

The Plan Proponents may alter, amend or modify the Plan at any time prior to the

Confirmation Date and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

## F.      Tax Consequences of Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN

MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN

ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible

tax consequences is intended solely for the purpose of alerting readers to possible tax issues this

Plan may present to the Debtor. The Proponent CANNOT and DOES NOT represent that the tax

consequences contained below are the only tax consequences of the Plan because the Tax Code

embodies many complicated rules which make it difficult to state completely and accurately all the

tax implications of any action.

## G.      Risk Factors

As discussed in Section IV(C) (Feasibility), the principal risk to creditors is that 1663

might not have the financial wherewithal to make the payments required under the PSA and Plan.

However, 1663 has represented that it will be able to so fund. Further, its principals and

committed investors have sufficient liquid assets to fund the Plan themselves should they so elect. Debtors, in their business judgment, have concluded that the risk is therefore minimal.

You are encouraged to engage counsel to form your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety. The Plan Proponent believes that the Plan is viable and will meet all requirements of confirmation.

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.   The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be proposed in good faith, that creditors or interest holders have accepted the Plan, that the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and that the Plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

**A.      Who May Vote or Object**

   **1.      Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2.**      **Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

**a.**      **What Is an Allowed Claim/Interest**

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. For the purposes of this Disclosure Statement and the Plan, all creditors with "no liability" claims or whose claims will be paid in full after they are Allowed (as detailed herein and in the Plan), are not "impaired" and are not entitled to vote. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

<u>**THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS JULY 18, 2024.**</u>

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

**b.**      **What Is an Impaired Claim/Interest**

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3.     Who Is Not Entitled to Vote

The following four types of claims are not entitled to vote:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.     Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.     Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes (discussed below).

### 6.     Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds in dollar amount of the allowed claims that actually voted, voted in

favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds in amount of the allowed interest-holders of such class which actually voted, voted to accept the Plan.

### 7.    Treatment of Nonaccepting Classes

As noted above, even if <u>all</u> impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown".  The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The party proposing this Plan asks the Court to confirm this Plan by cramdown on impaired classes if any of these classes do not vote to accept the Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured

creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

In order for the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation.   The Plan Proponent maintains that this requirement is met here because all Allowed claims will be paid at least as much as they might receive under a Chapter 7 liquidation, as detailed on the Liquidation Analysis attached hereto as **Exhibit B**.

Additionally, if the Plan is confirmed and Sickles Market is reopened, as planned, Newco intends to initiate a program to honor approximately [**$800,000**] of gift cards that would otherwise be worthless, thus benefiting many local consumers. Moreover, a further benefit to the Community will resound from the contemplated assignment for the benefit ("***ABC***") of creditors of Sickles Market, LLC, an entity owned by Robert H. Sickles. In the absence of an ABC, none (or nearly none) of the creditors of Sickles Market, LLC would receive any recovery on the claims they hold against that entity. The ABC is made possible only because of the Plan.

**C.     Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a traditional feasibility analysis. The first considers whether the bankruptcy estate will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses entitled to be paid on the Effective Date.

The second aspect considers whether the bankruptcy estate will have enough cash over the life of the Plan to make the subsequent required Plan payments.

Both aspects of this analysis assume a traditional non-liquidating reorganization. In such situations, the availability of funds typically depends on the debtor's future operations and financial projections, its ability to borrow, and other factors that go to the heart of whether the reorganized debtor, as a going concern, can generate the necessary cash for payments required under the Plan.

Where, as here, however, all of the money necessary to make all Plan payments is being funded on the Effective Date, the above analysis is not relevant. In other words, the payments required by the Plan will not depend on the future operations of Newco at all.

Feasibility depends solely on whether 1663 will fund the Plan as it has committed to do. See Section III(G) (Risk Factors) for discussion of this issue.

Accordingly, the Plan Proponent believes, on the basis of the foregoing, that the Plan is feasible.

## V.

## EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge

The Plan provides that upon confirmation of the Plan, the Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. §1141.  However, any liability imposed by the Plan will not be discharged. If Confirmation

of the Plan does not occur or if, after Confirmation occurs, the Debtor elects to terminate the Plan, the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims against the Debtor or its estate or any other persons, or to prejudice in any manner the rights of the Debtor or its estate or any person in any further proceeding involving the Debtor or its estate.  The provisions of the Plan shall be binding upon the Debtors/Plan Proponents, Plan Co-Proponent, all Creditors and all Equity Interest Holders, regardless of whether such Claims or Equity Interest holders are impaired or whether such parties accept the Plan, upon Confirmation thereof. Attached hereto as **Exhibit C** is a restatement from the Plan detailing all releases and exculpation granted in the Plan.

**B.      Revesting of Property in the Debtor**

As of the Effective Date, pursuant to the provisions of sections 1141(b) and (c) of the Bankruptcy Code, the Plan Consideration shall vest in Newco and the Revested Assets shall vest in the Reorganized Debtor, in each case free and clear of all Claims, Liens, encumbrances, charges, Equity Interests, and other interests, except as otherwise expressly provided in the Plan or the Confirmation Order, and subject to the terms and conditions of the Plan and the Confirmation Order.

**C.      Modification of Plan**

The Proponent may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or revoting on the Plan if Proponent modifies the plan before confirmation.

The Proponent may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modification after notice and a hearing. Proponent further reserves the right to modify the

treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

**D.      Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under Section 1112(b), after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Section 1112(b).  If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during this case.

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree.

December 12, 2024                    **ROBERT H. SICKLES**
                                     **AHS REALTY, LLC**

                        BY: _/s/ Robert H. Sickles_____
                            **ROBERT H. SICKLES**
                            *Individually, and as*
                            *Managing Member of AHS Realty, LLC*
                            *Plan Proponent*